**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SKYY ALEXANDER CRAWFORD PORTER, | ) ) | CASE NO. 1:20-cv-02079 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) ) | MAGISTRATE JUDGE DAVID RUIZ |
| | ) | |
| KILOLO KIJAKAZI, | ) | **REPORT AND RECOMMENDATION** |
| *Acting Comm'r of Soc. Sec.* | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Skyy Alexander Crawford Porter (Plaintiff or Crawford), challenges the final

decision of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security

(Commissioner),[1] denying his application for Supplemental Security Income (SSI) under XVI of

the Social Security Act, 42 U.S.C. § 1381 *et seq*. (Act). This court has jurisdiction pursuant to 42

U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to

an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the

reasons set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

**I.  Procedural History**

Plaintiff's mother, Sonja Meria Crawford, acting on behalf of Plaintiff, then a minor child,

applied for SSI on September 26, 2014, alleging a disability onset date of May 1, 2011. (R. 11

---

[1] Pursuant to Rule 25(d), the previous "officer's successor is automatically substituted as a party." Fed.R.Civ.P. 25(d).

Page ID# 180-183, Transcript (Tr.) 109-112). She identified the following conditions: traumatic brain injury with ataxia, fine motor skill impairment, non-epileptic seizures, oppositional defiance disorder with ataxia, fine motor skill impairment, severe sleep disorder, depression, anxiety, post-traumatic stress disorder with disassociation, attention deficit hyperactivity disorder, and autism. (Tr. 134, 154). The application was denied initially and upon reconsideration, and his mother requested a hearing before an Administrative Law Judge (ALJ). (Tr. 66-68, 70-72, 73-75).[2] Plaintiff's mother waived the right to personally appear and testify. (Tr.19, 103). On December 6, 2016, the ALJ found Plaintiff not disabled. (Tr. 16-34, 878-896). On February 2, 2017, Plaintiff's mother identified counsel on Plaintiff's behalf, and also filed a request for review of the hearing decision. (Tr. 105, 933).

Plaintiff attained the age of 18 in 2017. On April 23, 2018, the Appeals Council denied Plaintiff's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-4, 901-904). Plaintiff appealed the Commissioner's decision and on October 18, 2018, the court remanded the case pursuant to the parties' stipulation under Sentence Four of Section 205 of the Social Security Act, 42 U.S.C. § 405(g). (Tr. 908).[3] The Appeals Council vacated the previous decision, and remanded the case for the resolution of the waiver of Plaintiff's right to appear at the hearing, further evaluation of Plaintiff's impairments, and further evaluation of the opinion evidence. (Tr. 909-914).

On July 25, 2019, the ALJ held a new hearing in which Plaintiff did not appear, but was represented by counsel. (Tr. 854). The ALJ determined Plaintiff constructively waived his right

---

[2] Barry Simon, D.O. filled out Form SSA-604 Certificate of Incapacity dated July 31, 2016; however, this form applies to the children of federal employees over the age of 26. (Tr. 759-761).
[3] *Skyy Alexander Crawford Porter v. Commissioner of Social Security,* Case No: 1:18-CV-01408 (N.D. Ohio Oct. 18, 2018) (Adams, J.).

to appear and conducted the hearing without objection. (Tr.852-871). A vocational expert (VE) and a medical expert (ME) participated and testified. *Id*. The ALJ found Plaintiff not disabled, on August 7, 2019. (Tr. 814-850). On September 5, 2019, Plaintiff submitted written exceptions disagreeing with the ALJ's findings and conclusions. (Tr. 1017-1019). The Appeals Council, on July 13, 2020, declined to assume jurisdiction, and the ALJ's decision became the Commissioner's final decision. (Tr. 807-810, 878-900).

Plaintiff's present complaint challenges that final decision, and the parties have completed briefing. (R. 1, 13, 15). Plaintiff asserts the ALJ erred when assessing his residual functional capacity. (R. 13, Page ID# 1964). In support, he provides three separate theories alleging the ALJ, with respect to childhood and adult disability, did not offer valid reasons for ignoring evidence, rejecting examining sources, and not accounting for sustainability in the analysis. (R. 13 PageID# 1965). Because the ALJ's decision rendered findings addressing the period before and after the Plaintiff turned eighteen in 2017, the court includes a more extensive statement of the records addressing each period.

## II. Evidence[4]

### A. Relevant Medical Evidence

#### 1. Childhood Treatment Records

Plaintiff's mother alleged the disability onset date predated his September 2014 application and coincided with a concussion in May 2011. (Tr. 315, 751-755).[5] Plaintiff reported no

---

[4] The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also those deemed relevant by the court to the assignments of error raised.

[5] There are no treatment records from 2011, but the record contains detailed summaries from Plaintiff's mother. (*See, e.g.*, Tr. 314-315, 1870).

complaints of headaches in September 2012. (Tr. 416). Plaintiff required inpatient hospitalization from December 4-16, 2013 for suicidal ideation.[6] (Tr. 416, 1144, 1151). During his stay, Plaintiff endorsed episodes of disorganization, disassociation, and difficulty falling asleep due to anxious, sad and angry thoughts. (Tr. 1151). Plaintiff improved with medication, and discharge diagnoses included a mood disorder, not otherwise specified, anxiety disorder not otherwise specified, rule out derealization-depersonalization disorder, cannabis abuse, and rule out attention deficit hyperactivity disorder (ADHD). (Tr. 1151).

John J. Adamo, CNS-BC treated Plaintiff through the summer of 2014 for a mood disorder, ADHD, and severe family and academic stressors. (Tr. 610, 612). Patricia A. Klaas, Ph.D. conducted a neuropsychological evaluation on May 23, 2014, and assessed a test result profile consistent with injury to the left frontal and temporal lobe. (Tr. 585-588, *see also* Tr. 617-623). During testing, Plaintiff appeared appropriately dressed and groomed, friendly and cooperative, with an easy rapport and good frustration tolerance. (Tr. 586). He complained of being tired, but it did not affect performance. *Id.* On Wechsler Intelligence Scale for Children IV (WISC-IV) Plaintiff obtained a Full-Scale IQ of 117, a Verbal Comprehension score of 110, Perceptual Reasoning score of 115, Working Memory score of 104, and a Processing speed score of 121. *Id.*

---

[6] Although early treatment records do not address migraine headaches and memory loss, Plaintiff did undergo treatment throughout the record for complaints of chest pain, abdominal pain, fine motor control and back pain. (see. Tr. 269, 332, 367, 388-389/403, 416-417, 416, 465, 587, 1144, 1146-1149, 1290, 1441-1443, 1505, 1508-1513, 1559-1562). The ALJ did not address these impairments. While Plaintiff suggests symptoms of neck pain and poor balance should have been considered, he did not assert any assignment of error with respect to the ALJ's finding of Plaintiff's severe impairments either as a child or as an adult. (R. 13. PageID# 1967). Therefore, the Court has not addressed these records, as any argument is deemed waived. *See, e.g.*, *McClellan v. Astrue*, 804 F. Supp.2d 678, 688 (E.D. Tenn. 2011) (The Court under no obligation to scour record for errors not identified by claimant).

Plaintiff had an immediate recall of visual information score of 118, immediate recall of verbal information of 85, and delayed recognition score of 115. (Tr. 587).

Dr. Klaas described Plaintiff as:

> [A]n intelligent young man who does not appear to have any type of disability/injury, but this is what happens with brain injury. He is aware that he is no longer functioning at the same level he once was, but it is not apparent to those around him and this causes distress and depression. His scores are not terrible by any means, but they are likely to represent a change for him and this has disrupted his ability to cope with the world.

(Tr. 588.). The doctor stated Plaintiff has experienced "significant difficulties with mood, anxiety, attention, working memory and processing speed. His cognitive profile indicates that he is an individual who functioned at a very high (superior) level of intellectual ability prior to his injury and continues to exhibit some skills at that level even now." (Tr. 588). Dr. Klaas recommended Plaintiff continue counseling and transfer to a more structured classroom. *Id*.

Plaintiff then began attending Lawrence school, his third high school in three years, at the start of the 2014 school year, and repeated 10th grade. (Tr. 140, 1872). He initiated counseling and psychiatric treatment with John Spiesman, LSW and Diane Eden, M.D., in September 2014, however, treatment notes document his mother's reports of behavior rather than observations of Plaintiff. (Tr. 599-609).

On October 28, 2014, Plaintiff had an argument with a family member and required emergency treatment after consumed pills. (Tr. 329, 379). Emergency providers diagnosed Plaintiff with depression and intentional overdose. (Tr. 381).

By December 2014, Plaintiff reported past "spinning spells" had improved, which is supported by an "essentially normal" vestibular test on November 28, 2014. (Tr. 375, 428-429, 460-462). In December 2014, Plaintiff stated no longer experienced migraine headaches, but he continued to experience dizziness, general headache, and tinnitus. (Tr. 369). Sudeshna Mitra,

5

M.D. described Plaintiff's neurological exam as completely normal and theorized that the spells described by Plaintiff's mother were not seizures based on his presentation and recent psychiatric history; however, she ordered EEG testing and an otoneurology consultation. (Tr. 366, 370).

On January 5, 2015, otoneurologist Neil Cherian, M.D., observed Plaintiff was alert and oriented, with mild dizziness and unsteadiness. (Tr. 638-640). Dr. Cherian recommended vestibular rehabilitation. (Tr. 632). Amy Cassady, PT, also observed a musculoskeletal component associated with his symptoms; and subsequent otolaryngology records assessed Plaintiff with "migraines without status migrainosus, not intractable, unspecified migraine type." (Tr. 644, 1437).

Results from both a routine EEG dated January 12, 2015, and an overnight video EEG from February 3-5, 2015, were normal, thus confirming Plaintiff's possible "seizures" were actually non-epileptic, habitual movements, without ictal patterns on EEG. (Tr. 326, 458-459, 265). Therefore, Elaine Wyllie, M.D., prescribed ongoing psychiatric treatment, and the events subsided. (Tr. 264-265; *see also* Tr. 1226, 1326).

Concurrent with the February 2015 EEG evaluation, psychiatrist Tatiana Falcone, M.D. interviewed Plaintiff independently and with his mother. (Tr. 327). Plaintiff acknowledged that he was going to sleep at the wrong time, not sleeping well, and struggled with the previous unstructured nature of online school, resulting in irritability, difficulty focusing, and the need for structure. (Tr. 332). Dr. Falcone observed abnormal signs including trauma related anxiety, a sad and worried mood, thoughts of suicide, slight impairment in judgment, and distractibility. (Tr. 335). Plaintiff otherwise maintained a pleasant and interactive behavior, appropriate speech, full affect, and appropriate thought process; and he logically approached problem solving. (Tr. 335). Dr. Falcone diagnosed Plaintiff as having Posttraumatic Stress Disorder-Chronic, Generalized

6

Anxiety Disorder, Child Onset Disorders Attention-Deficit/Hyperactivity Disorder, Combined

Type, Mood Disorder NOS, and Substance Related Disorder to be treated with a medication

change and intensive outpatient therapy. (Tr. 337).

Plaintiff left the hospital after the video EEG, only to present one day later, on February 6,

2015, for emergency treatment based on parental allegations of outbursts and continued thoughts

of suicide. (Tr. 265, 274-275, 276, 296, 302-303). Plaintiff endorsed symptoms of mania

including activation, bursts of energy, nights without sleeping, staying awake to play video

games, increased irritability, mood lability, and angry outbursts. (Tr. 265, 274-275, 276, 282,

296, 302-303). Dr. Falcone held Plaintiff to adjust his medications under supervision. (Tr. 293).

Interactions with Plaintiff's mother lead hospital staff to call Plaintiff's therapist, Dr. Caito, who

described Plaintiff as "a good kid but struggles to manage mood" and stated that Plaintiff's

"family seems to present him as more mentally ill than what he is." (Tr. 294). Dr. Caito

considered Plaintiff's home environment to be a struggle. (Tr. 294). Plaintiff was discharged on

February 10, 2015, (Tr. 708). Mackenzie Varkula, D.O., did not recommend residential

treatment, but recommended family therapy, concluding, "mom is magnifying and attributing

behaviors as 'mental illness.'" (Tr. 298, 708).

On June 5, 2015, Dr. Falcone described Plaintiff's complaints of fatigue and headaches as

having a moderate impact on functioning. (Tr. 1960). Barry Simon, D.O. took over medication

management from Dr. Falcone in October 2015, and described Plaintiff as having a depressed

mood with otherwise normal mental status examination. (Tr. 1212, 1218). Both Dr. Simon's

treatment records and school records documented significant absences from school during the

2015-2016 school year. (Tr. 1224-1225, 1758). By July 2016, Dr. Simon described Plaintiff as

having a normal mental status exam, but also informed Plaintiff that his issues "appear to be underwritten by poor coping skills leading to depression and anxiety." (Tr. 756, 1230).

Concurrent with mental health treatment, Carol Rosen, M.D. stated in May 2014 that Plaintiff's poor sleep was not due to a sleep disorder or physical ailment. (Tr. 610). Records in 2015 show Plaintiff's complaints of headaches, fatigue, and sleep disturbances lead to a Polysomnograph and subsequent July 10, 2015 adenotonsillectomy and inferior tube reduction to treat obstructive sleep apnea. (Tr. 1323, 1434). While later records show Plaintiff continued to complain about some headaches and poor sleep, he also repeatedly acknowledged that he did not follow a prescribed sleep routine. (Tr. 1294, 1297, 1336, 1338). In a June 3, 2019 letter, Jonathan Richardson, PCC reiterated that Plaintiff's functioning from May 2016 through May 2017 was challenged by mood, sleep disturbances, and non-compliance with treatment. (Tr. 1687).

On October 12, 2016, Robin Benis, M.D., performed a physical examination at the request of the Division of Disability Determination. (Tr. 794-799). Dr. Benis observed Plaintiff to have intact sensation, 5/5 strength in the upper and lower extremities, 5/5 grip strength bilaterally, normal reflexes and normal mood. (Tr. 797-298). Dr. Benis diagnosed Plaintiff with a history of traumatic brain injury/concussion, history of migraine headaches, psychiatric disorders, post-traumatic stress disorders, sleep disorder, anxiety and non-epileptic seizures. (Tr. 798).

On December 24, 2016, Deborah Koricke, Ph.D. performed a psychological evaluation of Plaintiff, accompanied by his parents, at the request of the Division of Disability Determination. (Tr. 800). Dr. Koricke observed Plaintiff appeared overly anxious, quiet, reserved, difficult to engage, restless, annoyed, agitated, with difficulty maintaining attention and concentration. (Tr. 804). Plaintiff reported feeling sad, but denied suicidal ideation, thoughts of worthlessness, hopelessness, helplessness, guilt, fear, phobias or panic. (Tr. 804). Dr. Koricke noted Plaintiff

8

often mumbled and was difficult to understand.. (Tr. 805). Relying on Plaintiff's mother's statements regarding activities of daily living, behavior, judgment and insight, Dr. Koricke diagnosed Plaintiff with ADHD, unspecified bipolar disorder, and unspecified anxiety disorder. (Tr. 803-805).

On March 20, 2017, Plaintiff's mother called the police to report Plaintiff's opposition and defiance, resulting in emergency treatment. (Tr. 1373). Police confirmed Plaintiff had attempted to remove himself from an argument escalated by his mother, which contributed to Plaintiff's agitation, but he otherwise maintained a normal mental status. (Tr. 1373-1374, 1385). The hospital discharged Plaintiff, however, they admitted him for inpatient treatment following another family argument on Hospital grounds. (Tr. 1376, 1384-1385). Treatment records describe his mother insisting Plaintiff required residential treatment, and his 24-hour stay concluded with Dr. Varkula describing the situation as follows:

> The family presents inconsistent stories, has switched providers on numerous
> occasions and then does not consistently come to appointments or followed
> through with medical recommendations***I see no need for seeking a higher
> level of psychiatric care***I have concern that Skyy's mother was antagonistic in
> her interactions with Skyy and therefore contributed to his admission.

(Tr. 1385).

On April 17, 2017, just before Plaintiff's 18th birthday, staff member Rachel K. Lehiff completed a Youth Mental Health Assessment, and Plaintiff stated he doing "pretty well" with increased sleep, even though he continued to have headaches and depression. (Tr. 1871). Lehiff summarized discrepancies in family member statements, indicating that Plaintiff and his parents seem to have different perspectives on his symptoms and needs. Lehiff also stated:

> Client reported that he has been missing extensive periods of school, which he
> relates to his sleep and headaches; he indicated to missing weeks of school at a

9

> time as a result***It was also undetermined as to how much client is actually in pain/discomfort verse avoiding or "lazy" behaviors.

(Tr. 1877).

### 2.  Education Records

Plaintiff attended Rattner school through the eighth grade, a Montessori High School for ninth grade (Tr. 294), and transferred to Insight online school for 10th grade in 2013-2014, where he missed more than two months due to dizzy spells. (Tr. 294, 394). He began attending Lawrence school at the start of the 2014 school year, and repeated 10th grade. (Tr. 140, 1872). On November 25, 2014, Denise Brown-Triolo, Director of Support Services at Lawrence School, completed a "Teacher Questionnaire" described him as at grade level in reading, math and writing, and stating he did not frequently miss school. (Tr 142-150, *see also* Tr. 614-615). Brown-Triolo stated Plaintiff received educational accommodations including extended time and small groups daily. *Id*.

Cleveland Municipal School District issued an Evaluation Team Report (ETR) April 7, 2015. (Tr. 164, 179, 181). [7]  As part of the report, School Psychologist Gail Porter noted:

> [Plaintiff] will benefit from intervention, accommodations and modifications. He benefits from a consistent daily routine, minimal distractions in the classroom, frequent monitoring of independent work, extra test time, explicit structure, and support to complete tasks, and assignments presented one at a time with clear expectations on what tasks should be completed. The amount of time at which [Plaintiff] is expected to work on a single tasks should be monitored so it is not so long that it contributes to his inability to complete assignments. He may need verbal prompting and supervision during assignments. He may respond to a rewards program for completed work and when possible assignments given at his interest level. He also may need review of organizational skills.

_____

[7]  The CMSD ETR report refers to a May 30, 2014, ETR/IEP by Crawford Education Solutions in Phoenix, Arizona. The report is not part of this record, however, CMSD adopts potions, including the adoption of Dr. Klaas' May 2014 findings.

(Tr. 170).

On March 13, 2017, Cheryl Cook with Lawrence School informed Plaintiff and his mother that Plaintiff was failing two courses necessary for graduation; Plaintiff obtained his high school diploma in August 2017. (Tr. 1031, 1560, 1691-1692). Plaintiff achieved a 4.0333 GPA in 2014-2015, a 3.4600 GPA in 2015-2016, and a 3.6863 GPA in 2016-2017. (Tr. 1692).

### 3. Adult Treatment Records

Plaintiff continued with community psychiatric support treatment after he turned 18, and continued to have diagnoses of major depressive disorder, recurrent episode, moderate with melancholic features and cannabis disorder, mild while presenting with normal mental status examinations. (Tr. 1865, 1876-1779, 1784-1786).

In June 2017, Ye Zhu, M.D., examined Plaintiff, who complained of pain, anxiety and stress. (Tr. 1441-1142). Dr. Zhu observed Plaintiff's unremarkable presentation, noted his statements that he could "eat out" and go hiking, and referred Plaintiff for physical therapy and a neurology consultation. (Tr. 1442-1443).

Plaintiff subsequently reported that he stopped taking medication in June 2017, and attempted suicide in July 2017. (Tr. 1463, 1788). In July 2017, case worker Mark Kline described divergent approaches to treatment plans between his mother, father and Plaintiff, resulting in problematic communication issues and gaps in stories. (Tr. 1859, 1863). Also in July 2017, neurologist A. David Rothner, M.D., documented Plaintiff's complaints of migraine headaches three times per month and daily smaller headaches, tinnitus, positional vertigo and difficulty reading. (Tr. 1450-1451). Dr. Rothner's exam showed Plaintiff to be functionally normal, and he recommended Depakote and acupuncture for the reported migraines. (Tr. 1451).

Plaintiff remained off his medication in August 2017, resulting in a self-described "all over the place" mood, uncontrolled anxiety, difficulty sleeping, racing thoughts and distractibility. (Tr. 1788-1790, 1792). Despite Plaintiff's reports, Kline and Dr. Simon observed Plaintiff's mental status examinations to be unremarkable and encouraged him to resume the medication. *Id.* Dr. Simon diagnosed Plaintiff as having a conversion disorder and avoidant personality, in addition to anxiety, mood disorder, oppositional defiant disorder and non-epileptic seizures; and theorized:

> I would not be surprised if the patient continued to have significant bouts of depression, manic episodes or even psychosis. Whether it is his premorbid psychiatric illness that is causing his poor coping or his poor coping that is causing his premorbid psychiatric illness it is difficult to ascertain.

(Tr. 1469-1460). During a follow-up appointment on September 19, 2017, Dr. Simon described Plaintiff as sleeping better and functioning better while taking Remeron and Effexor XR. (Tr. 1483, 1560).

The record is silent on any treatment between August 2017, and the August 2, 2019 decision.

### 4. State Agency Opinions

On December 12, 2014, and January 2, 2015, state agency psychologist Kristen Haskins, Psy.D, and state agency physician Louis Goorey, M.D., reviewed evidence and completed a Childhood Disability Evaluation (Tr. 58-60). Together, Dr. Haskins and Dr. Goorey found Plaintiff had less than marked functioning in the domains of: 1) Acquiring and Using Information, 2) Attending and Completing Tasks, 4) Moving About and Manipulation of Objects, 5) Caring for Yourself and Health and 6) Physical Well-being. *Id.* They found Plaintiff to have no limitation in Domain 3: Interacting and Relating With Others (Tr. 59).

12

On May 8, 2015, and May 27, 2015, state agency psychologist Courtney Zeune, Psy.D., and State agency physician Frank Stroebel, M.D. also reviewed evidence and completed a Childhood Disability Form (Tr. 47-49). Together, Dr. Zeune and Dr. Stroebel, concurred with the prior consultants' assessments. (Tr. 48).

### 5. Treating Source Opinions

On March 6, 2015, Dr. Falcone provided a statement that she had been treating Plaintiff since February 7, 2015, for diagnoses including "PTSD, GAD, ADHD, Pediatric non Epileptic events (conversion disorder), Mood disorder." (Tr. 257). Dr. Falcone stated, "[P]sychologically, he appears to have difficulty with impulse control, anger and difficulty sustaining relationships. Patient and guardian endorse symptoms of depression, anger, substance abuse in the past TCH), anxiety, impulsivity, rage and insomnia." *Id.* Dr. Falcone stated that Plaintiff "meets criteria for diagnoses of ODD vs GAD vs Bipolar Spectrum Disorder" and his medications were Abilify and Klonopin. *Id.* Dr. Falcone, recommended that if episodes of "non-epileptic events" happen at school, Plaintiff should receive a 15-30 minute break with adult supervision outside of his regular classroom and then return to the classroom.

On July 31, 2016, Dr. Simon noted that "[d]espite a very high IQ and the ability to perform well on standardized tests he missed four months of school last year and without maximal parental supervision does not accomplish activities of daily living." (Tr. 756). Dr. Simon's letter appears the record after the "remarks" section of a check-box Mental Residual Functional Capacity Assessment form in which he checked "marked" limitations the areas of: sustained concentration and persistence, the ability to ask simple questions or request assistance, and the ability to set realistic goals or make plans independently. (Tr. 754-755). Dr. Simon also

13

noted "moderate" limitations in several areas of social interaction, understanding and memory, and adaptation. (Tr. 754-755).

### 6. Examining Physician/Psychologist Opinions

On May 23, 2014, Neuropsychologist Patricia Klaas, Ph.D., stated that Plaintiff had a disrupted ability to focus and concentrate, and he would benefit from support at home and at school. (Tr. 619). The provider stated:

> [S]tructured and highly organized classrooms in which the goals are clearly identified***occupational therapy***to help him develop a system for organizing his work***At home, [Plaintiff] needs to have a regular routine that is maintained several days a week as much as possible***the more predictable and stable the routine, the more organized behavior will become.
>
> ****
>
> ***It is likely that repetition will greatly facilitate his ability to recall material. It may be necessary to read material several times in order for him to fully grasp the material. Individuals around him should not hesitate to repeat things as much as he needs repetition. It may be helpful for them to provide visual supplementation of auditorily presented material***More generally, [Plaintiff] should be helped to organize notebooks, work within a designated study area, and use other forms of support at home and school.
>
> ***[Plaintiff] needs to have activities that are expected of him broken down into smaller, discreet units. He will not be able to handle lists and we should not expect him to be able to take a list and complete the different activities on it. He may have difficulty in situations which emphasize freedom of choice and which do not prevent explicit structure or external support in completing tasks. Structure should be made explicit for him. In school, expectations for completing assignments should be carefully established. He will do better if assignments were presented to him one at a time with clear expectations as to when the tasks should be completed. The amount of time at which he is expected to work on a single task at one time should be monitored so that it is not so long as to contribute to him losing interest or becoming lost in the details. External support around organizational skills, such as keeping his desk neat and orderly, keeping track of his assignments, maintaining homework assignments and other aspects of organization should be provided.

(Tr. 619-620).

14

On July 23, 2014, Dr. Klaas stated that she expected Plaintiff to demonstrate improvement "across the next six months" with access to consistent psychotherapy and occupational therapy (Tr. 185, 258).

On October 12, 2016, consultative physician Dr. Benis opined Plaintiff could "participate in age-appropriate activities at school and continue with his IEP." (Tr. 798).

On October 24, 2016, consultative psychologist Dr. Koricke opined regarding Plaintiff's ability to acquire and use information compared to other seventeen year olds, noting Plaintiff "will require more redirection to sustain focus and given small segments of information. In addition, his problems with attention, and his issues with anxiety will also negatively impact his abilities to acquire and use information." (Tr. 805). Dr. Koricke opined that "[h]is problems related to ADHD, anxiety, and bipolar disorder will lead to difficulties in attending to and completing age-appropriate tasks." (Tr. 806). She noted Plaintiff "will likely have difficulty interacting with peers his age." *Id*. Lastly, regarding self-care, Dr. Koricke opined, "he shows poor frustration tolerance and mother indicates he requires redirecting at all times. When frustrated, he presents with behavioral outbursts and emotional extremes." *Id*.

On March 15, 2017, neurologist A. David Rothner, M.D. submitted a letter stating:

> Skyy's headaches, compounded by his multiple other disorders and symptoms have a significant impact on his functioning. His daily headaches can interfere with his ability to concentrate, problem solve, and complete assignments. At times, they may also effect his ability to attend the entire school day. His Periactin along with his sleep disorder may result in residual daytime sleepiness. His chronic headaches can also impact his mood, increasing his irritability. From a neurological perspective, I continue to make medication changes with the goal of reducing Skyy's headache frequency and intensity.
>
> School accommodations may prove helpful in reducing Skyy's anxiety and headache frequency. More specifically, I would recommend extended time for assignment and exam completion plus tutoring support as needed.

(Tr. 1348).

15

### 7.  Medical Statements

On March 7, 2017, Dr. Royce, provided a letter indicating the following:

> The nature of Skyy's illness is chronic and has not been responsive to numerous
> evaluations by a number of specialists. I believe that Skyy needs a prolonged in patient
> stay to assess and treat his psychiatric mood/conduct disorder. In my opinion, Skyy
> requires an ongoing monitored living situation where therapies can be titrated. In such a
> setting, the close monitoring would enable treatment for the delayed sleep phases. In
> summary, Skyy has poor sleep hygiene with delayed sleep phase in the face of
> psychiatric disease. Until the psychiatric issues surrounding sleep can be addressed, Skyy
> will continue to have difficulty.

(Tr. 1346).

On June 3, 2019, Jonathan Richardson, PCC, provided a letter summarizing his treatment

history with Plaintiff from May 2016-May 2017. (Tr. 1687). Richardson described Plaintiff's

diagnoses and treatment plan and stated:

> Medications were reevaluated and prescribed but did not appear to improve client
> functioning. Mr. Porter was not doing well in getting up to go to school and
> completing assignments was very much diminished. At varying points in therapy,
> Mr. Porter would be doing well and go into a depression or at times have heightened
> anxiety. Mr. Porter also was not always compliant with taking his medications.
> Treatment goals focused on managing emotions and conflict and included anger
> management and Assertive communication training.

*Id.*

### 8.  Educator Opinions & Statements

In 2014, Brown-Triolo rated Plaintiff's functioning by indicating he had a serious problem

learning new material, recalling and applying previously learned material, and applying problem

solving skills in class discussion; an obvious problem comprehending oral instructions and

understanding/participating in class discussion; a slight problem understanding school and

content vocabulary, reading and comprehending written material, comprehending and doing

16

math problems and providing organized oral explanations and adequate descriptions; and no problem expressing ideas in written form. (Tr.143).

On May 19, 2019, Courtney McCrary, M.S., reported Plaintiff registered with The Ohio State University Disability Services. (Tr. 1685). Ohio State provided accommodations including extended time on exams, distraction reduced testing space, and an attendance and deadline modification. *Id*. Plaintiff reported his symptom exacerbation impacted his ability to attend classes and complete coursework, even with accommodations, resulting his withdrawal from the Fall 2018 and Spring 2019 semesters. *Id.* She noted that Plaintiff "is enrolled full time for the fall 2019 semester and believes that he will be successful academically with the support of his care team and resources on campus, such as Disability Services." *Id.*

In June 2019, nearly two years after Plaintiff graduated high school, Jason M. Culp, Head of Upper School Campus at Lawrence School stated:

> Skyy was highly intelligent, but his cognitive processes were significantly slowed by his various health concerns. As such, Skyy was often unable to complete assigned classroom tasks or homework assignments. Even with significant accommodations provided by his teachers and other school staff, Skyy struggled to keep up academically and, ultimately did not graduate on time. Skyy's medical concerns were ongoing and life-limiting during his time at Lawrence School.

(Tr. 1689).

### 9. Relevant Hearing Testimony by Medical Expert Dr. Martinez

Dr. Martinez testified that Plaintiff's impairments[8] covered the entire period at issue and did not meet or equal a listed impairment when Plaintiff was a child or an adult. *Id.* Regarding the

---

[8] Dr. Martinez testified that the record contained a number of mental health conditions that, while called different names, were often the same diagnosis, including ADHD, various mood disorders, various anxiety disorders, a traumatic brain injury or concussion, and potential PTSD. (Tr. 856).

six functional domains for childhood disability, Dr. Martinez focused on mental health issues (Tr. 857), testifying Plaintiff had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting with others, and in the domain of caring for oneself. (Tr. 857-859). Regarding Plaintiff's functioning an as adult, Dr. Martinez testified he had a mild limitations in his ability to understand and remember instructions; moderate limitations in his ability to interact with others, to maintain concentration, persistence or pace; and mild ability to adapt and manage himself. (Tr. 858).

### III. Disability Standard

The standard to qualify for disability differs for an adult and a child. For a child to qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C). The regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At step one, the child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, the child must suffer from a "severe impairment." 20 C.F.R. §416.924(c). At step three, disability will be found if the child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To make this latter determination, the Commissioner assesses the functional limitations caused by the impairment(s). 20 C.F.R. § 416.926a(a). This involves the consideration a child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5)

caring for herself/himself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment(s) results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairment(s) functionally equal the listings and the child will be found disabled. 20 C.F.R. § 416.926a(d). An "extreme" limitation is "more than marked," and one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id*. A "marked" limitation means "more than moderate" but "less than extreme," and is one that seriously interferes with functioning. 20 C.F.R. § 416.926a (e)(2)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id*.

If an impairment is found to meet, or qualify as the medical or functional equivalent of a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled. 20 C.F.R. § 416.924(d)(1). To functionally equal the listings, the claimant's impairment(s) must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. §§ 416.926a(b)(1) and (d). In assessing whether the claimant has "marked" or "extreme" limitations, the ALJ must consider the functional limitations from all medically determinable impairments, including any impairments that are not severe. 20 C.F.R. § 416.926a(a).

A claimant who has attained the age of 18 is entitled to receive benefits under the Social Security Act when he also establishes disability within the meaning of the Act. 20 C.F.R. 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any

19

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 416.905(a) and 416.909(a).

The Commissioner follows a five-stage evaluation. 20 C.F.R. § 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. § 416.920(b). Second, the claimant must show that he suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 416.920(g), 404.960(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on ***, 1999, and was therefore in the "Adolescents (age 12 to attainment of age 18)" age group on June 13, 2014, the date the application was filed (20 CFR 416.926a(g)(2)(v)). The claimant attained age 18 on ***, 2017 and is currently 20 years old (20 CFR 416.120(c)(4)).

20

2. The claimant has not engaged in substantial gainful activity since the date the application was filed (20 CFR 416.924(b) and 416.972).

3. Before attaining age 18, the claimant had the following severe combination of impairments: history of concussion with vertigo and headaches; history of non-epileptic events; attention deficit hyperactivity disorder; bipolar disorder with depression; anxiety disorder with post-traumatic stress; and autism spectrum disorder (20 CFR 416.924(c)).

4. Before attaining age 18, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Part A or B (20 CFR 416.920(d), 416.924, 416.925 and 416.926).

5. Before attaining age 18, the claimant did not have an impairment or combination of impairments that functionally equaled the listings (20 CFR 416.924(d) and 416.926a).

6. Because the claimant did not have an impairment or combination of impairments that met, medically equaled any listing or functionally equaled the listings, the claimant was not disabled prior to attaining age 18 (20 CFR 416.924(a)).

7. The claimant has not developed any new impairment or impairments since attaining age 18.

8. Since attaining age 18, the claimant has continued to have a severe impairment or combination of impairments (20 CFR 416.920(c)).

9. Since attaining age 18, the claimant has not had an impairment or combination of impairments that meets or medically equals a listed impairment (20 CFR 416.920(d)).

10. After careful consideration of the entire record, the undersigned finds that, since attaining age 18, the claimant has had the residual functional capacity (20 CFR 416.945) to perform light work as defined in 20 CFR 416.967(b), except for no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; no exposure to hazards (heights, machinery, commercial driving); and mental limitation that he perform routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation or confrontation), and no interaction with the general public as a job requirement (20 CFR 416.969a).

11. The claimant has no past relevant work (20 CFR 416.965).

12. The claimant is currently a "younger individual age 18-44" (20 CFR 416.963).

13. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

14. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

15. Since attaining age 18, considering the claimant's age, education, work experience, and residual functional capacity, jobs have existed in significant numbers in the national economy that the claimant has been able to perform (20 CFR 416.960(c) and 416.966).

16. The claimant has not been under a disability, as defined in the Social Security Act, from the alleged onset date of May 1, 2011, nor from May 5, 2017, the day the claimant attained age 18, and through the date of this decision (20 CFR 416.924(a) and 416.920(g)).

(Tr. 822, 824, 836, 842, 843).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id*. However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.  Plaintiff's Assignments of Error**

Plaintiff's assignment of error argues the ALJ lacked substantial evidence when determining his residual functional capacity. (R. 13 PageID# 1964). In support, Plaintiff provides three separate theories alleging the ALJ, with respect to childhood and adult disability, did not offer valid reasons for: ignoring pertinent evidence, rejecting findings and opinions of examining sources, and failing to account for sustainability in the analysis. (R. 13 PageID# 1965).

**1. Arguments Related to Childhood SSI Waived**

Plaintiff's brief has not challenged the ALJ's finding that Plaintiff had less than marked limitations in all six childhood functional domains, or that Plaintiff had no impairment that met or equaled a listing level impairment. (R. 15 PageID #1982). Additionally, Plaintiff does not challenge the ALJ's finding of severe impairments. Rather, Plaintiff broadly alleges the ALJ, after finding impairments, erred "in so finding with respect to both childhood and adult disability…" by "failing to consider pertinent evidence in his determination of Plaintiff's limitations as a child and his residual functional capacity." (R. 13 PageID# 1965-1966).

Plaintiff's brief, however, presents no evidence or a developed argument to support his conclusory statement regarding the ALJ's assessment of Plaintiff's childhood limitations. Other than the statement vaguely mentioning "Plaintiff's limitations as a child," Plaintiff fails to address how the ALJ failed to satisfy the requirements of Social Security Ruling (SSR) 09-1p, regarding the determination of childhood disability in conjunction with 20 C.F.R. §§416.924 & 416.926. The Plaintiff's perfunctory statements fail to even mention which, if any, of the six childhood domains, were impacted by the alleged errors; and the Court cannot review the record

23

to fashion an argument for a party. *See. e.g.*, *Kennedy v. Commissioner*, No. 03-1276, 2003 WL 23140056, at *1 (6th Cir. Dec. 12, 2003) (*citing* United States v. Elder, 90 F.3d 1110, 1118 (6th Cir. 1996)) (rejecting perfunctory argument); *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997), *cert. denied*, 523 U.S. 1050 (1998) (same); *McClellan v. Astrue*, 804 F. Supp.2d 678, 688 (E.D. Tenn. 2011) (court under no obligation to scour record for errors not identified by claimant). The *McPherson* court aptly stated: "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson*, 125 F.3d at 995-996 (internal citations omitted). Therefore, the Court rejects Plaintiff's perfunctory claim regarding childhood disability analysis.

## 2. Alleged Error With Respect to Residual Functional Capacity (RFC)

Plaintiff argues that the ALJ committed legal error by failing to consider the 2014 findings of Nurse Adamo, the reports of Dr. Ellington,[9] the findings of Dr. Cherion, a letter from Jason Culp, of the Lawrence School, and the opinion of 2016 counselor Richardson. (R. 13 PageID# 1966-1967). The Commissioner counters that the ALJ did cite to Adamo's objective findings, in addition to evidence demonstrating the same facts. (R. 15 PageID# 1982). Additionally, the Commissioner argues that while the ALJ did not cite all of the evidence of record, he did consider the evidence as a whole. (Tr. R. 15 PageID #1985). The ALJ considered substantial evidence, according to the Commissioner, addressing Plaintiff's reported head injury, ADHD, medication use, and sleep history, which were facts relevant to the reports cited by Plaintiff. (R.

---

[9] Plaintiff refers to Dr. Ellington as "Dr. Billington" through his Brief, and the Commissioner responded in kind (*see* R. 13 PageID# 1966-1967, R. 15 PageID# 1983). While both parties cite to Dr. Ellington's somewhat blurred name on Tr. 610, "Ellington" is clearly typed on Tr. 611, and the Court refers to him as such.

15 PageID# 1983). Moreover, the Commissioner asserts the ALJ also considered the evidence from Dr. Cherion, Plaintiff's physical therapy, and the information from addressed by Mr. Culp regarding attendance and ability to complete homework. (R. 15 Page ID# 1984).

The ALJ reasonably assessed Plaintiff's RFC, as explained herein. An individual's RFC is an indication of an individual's work-related abilities *despite* their limitations. 20 C.F.R. §416.945(a). The ALJ bears the responsibility for assessing a claimant's RFC, based on all relevant evidence. 20 C.F.R. § 404.946(c); *see also Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."). The ALJ must "articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Delgado v. Comm'r Soc. Sec. Admin.*, 30 Fed. App'x 542, 2002 WL 343402, at *4 (6th Cir. 2002) (quoting *Bencivengo v. Comm'r Soc. Sec. Admin.*, 251 F.3d 153 (table), [published in full-text format at 2000 U.S. App. LEXIS 38785] (3d Cir. Dec. 19, 2000).

Further, while the ALJ must consider all the evidence in the record, there is no requirement that the ALJ's decision discuss every single piece of evidence. *See, e.g., Atkinson v. Astrue*, 389 Fed. Appx. 804, 2010 WL 2977593, at *3 (10th Cir. 2010) (*citing Clifton v. Chater*, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (while ALJ must consider all evidence in record, nothing requires discussion of every piece of evidence)); *Thacker v. Commissioner*, 99 Fed. Appx. 661, 2004 WL 1153680, at *3 (6th Cir. 2004) (ALJ need not discuss every piece of evidence in the record). "Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not

indicate that it was not considered." *Simons v. Barnhart*, 114 Fed. Appx. 727, 2004 WL 2633448, at *6 (6th Cir. 2004) (*quoting Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

Plaintiff, while acknowledging that every single piece of evidence need not be considered, citing *Orlando v. Heckler*, argues that the ALJ failed to articulate his analysis. *Orlando v. Heckler* 776 F.2d 209, 213 (7th Cir. 1985); (R. 13 PageID# 1965-1966). In *Orlando v. Heckler*, the Seventh Circuit affirmed the district court judgment upholding the Secretary of Health and Human Services' denial of Orlando's application. *Id*. The Seventh Circuit considered the decision as a whole, not just the findings section, to determine whether the ALJ articulated some minimal level of evidence in "cases which considerable evidence is presented to counter the agency's position." *Id*. at 214, *citing Zblewski v. Schweiker*, 732 F. 2d 75, 79 (7th Cir. 1984). In doing so, the *Orlando* court concluded that the ALJ conducted more than a minimal articulation of Orlando's testimony, in addition to statements to physicians, and examining source reports before concluding plaintiff was not disabled. *Id.* at 213-214.

Here, as in *Orlando*, the ALJ's decision contains an evaluation of the medical and opinion evidence throughout multiple findings. (Tr. 830-839). Although the ALJ did not specifically cite to Adamo's November and December 2014 treatment records, Culp's letter, and Dr. Cherion's January 2015 examination, the Court finds no error as there is no requirement to cite every piece of evidence and ALJ considered records documenting similar complaints and observations, namely Plaintiff's mood swings, difficulty concentrating, and alleged seizure activity. (Tr. 1104-1112; Tr. 835 describing the vestibular study, video EEG monitoring performed after a January 2015 examination and treatment by Dr. Mitra; Tr. 824 "Ms. Crawford stated that as of November 15, 2014, the claimant's medical condition had worsened.).

The ALJ then built a logical bridge from childhood records to adulthood treatment records by evaluating: statements from Plaintiff's mother after he attained the age of 18 ("The Claimant's mother reported that the claimant isolated, was unmotivated, disrespectful to her, and he was defiant to her when he felt 'nagged.'") (Tr. 839); Ms. McCrary's statement in May 2019 regarding accommodations at The Ohio State University, Plaintiff's withdrawal and resumption as a full time student ("[H]is symptoms exacerbated and the conditions impacted his ability to attend classes on a regular basis and complete coursework."); (Tr. 837); the July 2017 suicide attempt (Tr. 838); and Plaintiff's symptoms such as "he still had severe headaches", he "struggled with attention and concentration" and "he reported some down moments." (Tr. 839-840).

Additionally, while the ALJ did not directly address Mr. Culp's letter, in concluding Plaintiff's allegations were not as severe as alleged, the ALJ considered the fact Plaintiff obtained his high school diploma.[10]  The ALJ evaluated Plaintiff's treatment records, after obtaining the age of 18, documenting unremarkable mental status examinations and statements by Plaintiff directly contradicting his mother's allegations, namely, he was able to leave the home, work, engage with friends, and go on hikes. (Tr. 839-840). This evidence specifically addresses the issues raised in Culp's letter, concerning accommodations, absences, and graduation. (Tr. 1689). Additionally, the ALJ also included the observations of consultative and state agency physicians and psychologists, which support the ALJ's decision and are not

---

[10]  The ALJ cites to Plaintiff's official transcript reference of May 26, 2017 as "Date Diploma Awarded" (Tr. 837 *citing* Tr. 1691). Cook told Plaintiff in March 2017 that he was in danger of not completing courses necessary for graduation. (Tr. 1031). Culp submitted a letter indicating Plaintiff did not graduate on time. (Tr. 1689). Treatment records reflect Plaintiff finished his required coursework in August 2017. (Tr. 1560).

27

challenged by Plaintiff, and he articulated his weight of treating source opinions. (Tr. 825-826). The ALJ's analysis reflects more than a minimal articulation of the record as a whole.

Plaintiff 's argument—that the ALJ's finding concerning the RFC is not supported by substantial evidence—is without merit. (R. 13 PageID# 1968-1969). Although Plaintiff contends that a more restrictive RFC accounting for absences should have been assessed based on the medical record, that belief, even if based on a reasonable interpretation of the evidence of record, does not establish a violation of the substantial evidence standard. Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (citation omitted). This means that administrative findings:

> are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Secretary may proceed without interference from the courts. If the [administrative] decision is supported by substantial evidence, a reviewing court must affirm.

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted); *accord Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604-05 (6th Cir. 2009). Under this standard, if there is evidence supporting the ALJ's less restrictive determination, then it is immaterial whether there is also evidence that could have supported a more restrictive RFC. The objective findings of Plaintiff's treating physicians, consultative and state agency physicians and psychologists, and the testimony of the medical expert constitutes such evidence.

Plaintiff argues that childhood records and statements from providers support the need to be absent from work. However, he does not dispute the ALJ's conclusion that the combination of impairments resulted in no more than mild and moderate limitations in consideration of the "B" criteria for Listings 12.02, 12.04, 12.06, 12.11 or 12.15. (Tr. 836-837). As stated, *supra*, Plaintiff

28

failed to make more than a perfunctory argument regarding his functional abilities as a child. Furthermore, the ALJ noted that the opinions and statements of treating sources were based on subjective statements from Plaintiff and his mother. (Tr. 831-832, Tr. 1384-1385, 1687).

The ALJ considered the objective mental status examinations conducted by Kimberly Clark, Dr. Zhu, and Dr. Simon after Plaintiff attained 18, which described Plaintiff as having signs of depression, but otherwise appearing alert and cooperative, with intact memory, normal concentration and attention, and appropriate fund of knowledge. (Tr. 839-840). Relying on objective evidence, the ALJ considered Plaintiff's statements to case worker Kline, just before he turned 18, describing his increased headaches, in addition to statements made as an adult to Dr. Simon and Dr. Zhu regarding headaches and difficulty concentrating, and the letter from Ms. McCrary describing his accommodations and ability to attend classes in college. (Tr. 839, 840). The ALJ considered Plaintiff's medications and subjective complaints associated with vertigo, headaches, and history of non-epileptic seizures in reducing him to a reduced range of light work. (Tr. 842). Lastly, the ALJ obtained the testimony of medical expert, Dr. Martinez, who testified that Plaintiff had no more than moderate mental limitations. Therefore, the Court finds the ALJ's conclusions, and the assessed RFC, are supported by substantial evidence.

**3.  Alleged Error with Respect to the Evaluation of Opinion Evidence**

Plaintiff argues the ALJ committed legal error by failing to offer good or valid reasons for assessing little weight to opinions of certain examining and treating physicians. (R. 13 PageID# 1967). He contends the ALJ erred by according limited weight to parts of Dr. Koricke's opinion, according limited weight to Dr. Rothner's opinion, by disregarding an opinion by Dr. Simon, and by not considering an opinion from counselor Richardson. (R. 13. PageID# 1966-1968).

29

The Court, however, agrees with the Commissioner that Richardson and Dr. Rothner's statements are not opinions. (R. 15 PageID # 1984, 1986). Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, **what you can still do despite impairment(s), and your physical or mental restrictions**." 20 C.F.R. § 416.927(a)(1) (emphasis added). In addition, subjective statements made to medical sources, physical therapist or educational institution are not per se credible, nor are they transformed into "medical opinions" simply because the patient's statements have been recorded in treatment notes. *See*, e.g., *Francis v. Comm'r of Soc. Sec*., 414 Fed. App'x 802, 804 (6th Cir. 2011) (the physician's statement "is not a 'medical opinion' at all—it merely regurgitates [the patient's] self-described symptoms").

In this instance, both Dr. Rothner and Richardson's letters reiterated Plaintiff's subjective complaints and presentation. Although Dr. Rothner also stated that the symptoms and impairments "have a significant impact on his functioning" and noted potentially helpful school accommodations (Tr. 826, *citing* 1348), the doctor did not include a prognosis or indicate what Plaintiff could still do despite his impairments. Similarly, Richardson provided a single document that he titled "Treatment Summary" that simply reiterated Plaintiff's subjective complaints, treatment plan, and diagnoses. (Tr. 1687). These diagnoses and records cited by Plaintiff are not opinions, but even construing them as such, they do not establish a level of limitation greater than the restrictions contained in the RFC. As such, the Court finds no error.

The ALJ considered Dr. Simon's treating relationship, noted it began in October 2015, but specifically rejected the provider's opinions. (Tr. 825). "Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally

accorded substantial deference, and if the opinions are uncontradicted, complete deference.'"

*Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (*quoting Harris v. Heckler*,

756 F.2d 431, 435 (6th Cir. 1985)). In other words, "[a]n ALJ must give the opinion of a treating

source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical

and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in

the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The Commissioner's response—that the ALJ reasonably evaluated Dr. Simon's opinion—is

supported by the record. (R. 15 PageID# 1987). Here, the ALJ provided sufficiently specific

reasons for rejecting Dr. Simon's July 2016 opinion regarding childhood disability. If an ALJ

does not give a treating source's opinion controlling weight, then the ALJ must give good

reasons for doing so that are "sufficiently specific to make clear to any subsequent reviewers the

weight the adjudicator gave to the treating source's medical opinion and the reasons for that

weight." *Wilson*, 378 F.3d at 544 (*quoting* Social Security Ruling (SSR) 96-2p, 1996 WL

374188, at *5). *See also Johnson v. Comm'r of Soc. Sec.*, 193 F. Supp. 3d 836, 846 (N.D. Ohio

2016) ("The requirement also ensures that the ALJ applies the treating physician rule and permits

meaningful review of the ALJ's application of the rule.") (Polster, J.). (R. 15 PageID# 1985-

1986).

The ALJ's discussion of the evidence relating to Dr. Simon's opinion satisfies the

requirements of the treating physician rule. When considering the doctor's opinions, such as

Plaintiff requiring maximum parental supervision to perform activities of daily living and having

marked limitations in his ability to carry out instructions and sustain a routine, the ALJ's

described the opinions as:

> [T]hey are not supported by his mental status exam examinations of the claimant
> documenting appropriate thought content and thought process, age-appropriate
> attention, age-appropriate judgment, and age-appropriate insight (20F/19 on
> October 12, 2015; and 20F/31 on July 29, 2016). Furthermore, they are not
> supported by the medical evidence of record, school records, or consultative
> examinations.

(Tr. 825).

The ALJ discussed Dr. Simon's own objective mental status examinations of Plaintiff, educational records, medication use, and the consultative examinations throughout the opinion, and highlighted in this passage specific records that did not support and were inconsistent with the provider's opinions. (Tr. 825, 826, 840-842). This includes the ALJ's discussion of Plaintiff's presentation before Dr. Simon as an adult, and Dr. Simon's observations of Plaintiff's appearance, speech, language, and functioning. (Tr. 840). Therefore, the ALJ's discussion concerning the supportability factors, along with the inconsistency of Dr. Simon's opinions with the treatment records, satisfied the treating physician rule. *See generally Crum v. Commissioner*, No. 15-3244, 2016 WL 4578357, at *7 (6th Cir. Sept. 2, 2016) (suffices that ALJ listed inconsistent treatment records elsewhere in the opinion); *Hernandez v. Commissioner*, No. 15-1875, 2016 WL 1055828, at *4 (6th Cir. Mar. 17, 2016). The ALJ considered the proper factors in determining how much weight to ascribe to Dr. Simon's statement even though the decision does not explicitly discuss each factor. *See Francis*, 2011 WL 915719, at *3 (the regulations require only consideration of the factors, and does not require an the ALJ to articulate "an exhaustive factor-by-factor analysis"); *Gayheart*, 710 F.3d at 376.

Finally, the ALJ properly evaluated Dr. Koricke's October 2016 opinion as an examining psychologist. The ALJ stated:

> Overall, the undersigned gives considerable weight to Dr. Koricke's opinion (it is
> a four-part opinion) because she had the benefit of examining the claimant and

> because of her area of specialty. However, the undersigned gives limited weight
> to parts of her opinion particularly the parts of the opinion that merely reiterate
> what Ms. Crawford told her (14F/6-7). Dr. Koricke's four-part opinion is more
> fully discussed below.

(Tr. 826).

The ALJ's, thereafter, afforded considerable weight to Dr. Koricke's opinion regarding Plaintiff's ability to acquire and use information. (Tr. 828). In doing so, the ALJ weighed Dr. Koricke's opinion based on the provider's observations of Plaintiff's speech, ability to answer questions, his ability to sustain attention, and his interaction, with Plaintiff's IQ and school records. (Tr. 828). The ALJ gave considerable weight to Dr. Koricke's opinion that Plaintiff had difficulties in attending and completing age-appropriate tasks based on her observations and examination. (Tr. 830). The ALJ accorded on "some weight" to Dr. Koricke's assessment regarding Plaintiff's ability to interact and relate, and "limited weight" to Dr. Koricke's assessment of Plaintiff's ability to care for himself, as Dr. Koricke specifically based those conclusions on Plaintiff's mother's statements regarding interactions and aggression. (Tr. 831).

While the Court appreciates Plaintiff's argument that Dr. Koricke's reliance on his mother's statements is appropriate given Plaintiff was a minor, taken in the context of the totality of the record, the ALJs' discussion and decision are reasonable. (R. 13 PageID# 1967). Specifically, the ALJ discussed his mother's antagonism of Plaintiff's symptoms, Plaintiff's statement that he stayed in his room to avoid his mother, other records describing the underlying sources of family conflicts, and school records describing the Plaintiff's interactions. (Tr. 831-832, 841). Thus, the ALJ appropriately weighed the opinion in the context of the record.

To the extent Plaintiff argues that the treatment notes were not inconsistent with the medical providers' opinions, such an argument essentially invites the court to evaluate and

compare the opinions of the medical providers and offer its own assessment regarding their consistency with the record. Such an invitation must be rejected as courts "may not reweigh conflicting evidence on appeal, but instead must affirm" if a decision is supported by substantial evidence. *Haun v. Comm'r of Soc. Sec.*, 107 Fed. App'x 462, 465 (6th Cir. 2004); *see also Steed v. Colvi*n, 2016 U.S. Dist. LEXIS 114027 (N. D. Ohio, Aug. 25, 2016) (McHargh, M.J.) ("While [the plaintiff] may disagree with the ALJ's explanation or her interpretation of the evidence of record, her disagreement with the ALJ's rationale does not provide a basis for remand."); *Kiser v. Colvin*, No. CV 14-170, 2016 WL 527942, at *3 (E.D. Ky. Feb. 8, 2016) ("To the extent that Plaintiff suggests that … evidence is open to another interpretation that favors his claim, the Court declines to reweigh the evidence in this fashion."); *Whetsel v. Comm'r of Soc. Sec.*, No. 2:15-CV-3015, 2017 WL 443499, at *8 (S.D. Ohio Feb. 2, 2017) ("[I]t is not this Court's job to reweigh the evidence, but only to determine if the ALJ has evaluated it in a reasonable fashion."), *report and recommendation adopted*, No. 2:15-CV-3015, 2017 WL 1034583 (S.D. Ohio Mar. 16, 2017). Having considered Plaintiff's arguments, the Court finds the ALJ evaluated the evidence in a reasonable fashion and rendered a decision based on substantial evidence.

## VI. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be AFFIRMED.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: February 7, 2022

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais,* 928 F. 3d 520, 530-31 (6th Cir. 2019).